James M. and Betty J. Wilson v. Commissioner.
Wilson v. Commissioner
Docket No. 88737.
United States Tax Court
T.C. Memo 1964-71; 1964 Tax Ct. Memo LEXIS 263; 23 T.C.M. (CCH) 462; T.C.M. (RIA) 64071; March 18, 1964
*263 The return of petitioners for 1954 was filed more than three but less than six years before the mailing of the statutory notice of deficiency to the petitioners. Held: Respondent has not sustained his burden of proving that petitioners omitted from their gross income for 1954 an amount properly includable therein in excess of 25 percent of the gross income reported by petitioners in their return for that year. Held, further: Under sec. 6501(a), Code of 1954, assessment and collection of the deficiency for 1954 is barred. John L. Carey, 645-663 Associates Bldg., South Bend, Ind., for the petitioners. Joseph T. de Nicola, for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined a deficiency in income tax of petitioners for the year 1954 in the amount of $4,734.84. The questions for our decision are whether one-half of dealer reserves released in 1954 by the Michigan National Bank constitutes income to petitioners in 1954 which was not reported in their gross income for that year and, if so, whether this amount is in excess of 25 percent of the gross income shown on petitioners' return for 1954. Findings of Fact Some of the facts have been stipulated and are so found. During the taxable year 1954, petitioners James M. Wilson (hereinafter sometimes referred to as Wilson or petitioner) and Betty J. Wilson, husband and wife residing in Syracuse, Indiana, filed, on a cash basis, a timely joint Federal income tax return for 1954 reporting gross income in the amount *266 of $31,334.71 with the district director of internal revenue at Indianapolis, Indiana. In 1946 Wilson commenced operation of a trailer dealership under the name of Wilson Trailer Sales. Sometime prior to 1950 John P. Barnard began operating a trailer dealership under the name of Barnard Trailer Sales. Both Wilson and Barnard bought trailers from Liberty Coach Company, Inc., (hereinafter sometimes referred to as Liberty Coach) which they sold on installment plans. The unpaid purchase price of each trailer was evidenced and secured by an assignable or negotiable instrument (hereinafter sometimes referred to as installment paper) retaining in the dealer defeasible title to, or lien on, the trailer, signed by the customer and payable on monthly installments over an agreed period of time. Wilson and Barnard had each deposited $2,000 with the Trust Department of the Michigan National Bank of Grand Rapids, Michigan, (hereinafter sometimes referred to as the Bank) in order to become participating dealers under the Liberty Home Plan Trust agreement and similar trust agreements. As participating dealers, Wilson and Barnard were able to sell their installment paper to the Bank. The Bank *267 would credit to a reserve account of the respective participating dealer a certain percentage of the unpaid balance of the installment paper at the time the Bank bought the paper from the respective dealer. This amount was retained by the Bank and when a contract had been fully paid, the Bank would release to such dealer that part of his reserve which had been retained because of the financing of the contract. On December 12, 1950, Wilson and Barnard entered into an agreement to conduct and operate a trailer sales business in the State of Texas under the name of Liberty Trailer Sales of Texas (hereinafter referred to as the partnership). The partnership agreement provided for the respective interests of Wilson and Barnard as follows: The interest of the respective parties hereto in the business and property of the firm are as here stated, to wit: John P. Barnard
one-half (1/2)
James M. Wilson
one-half (1/2) and all profits, if any, are to be apportioned and divided in proportion to such respective interests, and all losses, if any, are to be shared with the parties hereto in the same proportion, except that all losses resulting from tortious and unlawful acts *268 of either partner shall be charged to said partner in full. * * *
The formation of the partnership was effectuated by the merger of the assets of Wilson and Barnard which was stated in the agreement as follows: All of the assets of James M. Wilson dba Wilson Trailer Sales having lots in Fort Worth and Wichita Falls, to include all rights, equities and personal property thereof, and all of the assets of John P. Barnard dba Barnard Trailer Sales of Snyder, Texas, and all rights, equities and personal property thereof, are and hereby do become the property of the partnership. * * *
Pursuant thereto all of the reserves held by the Bank in the name of Wilson Trailer Sales and Barnard Trailer Sales became the property of the partnership. The partnership assumed all the liabilities of Wilson doing business as Wilson Trailer Sales, and of Barnard doing business as Barnard Trailer Sales. The partnership thereafter sold installment paper to the Bank as a participating dealer under the trust agreements. In January 1951, shortly after the partnership was formed, Wilson and Barnard agreed to a sale of Wilson's partnership interest to Barnard for $18,000. When Liberty Coach was *269 apprised of the contemplated sale by Wilson to Barnard, it became apprehensive over its security position in regard to the trailers and other inventory sold to them, and requested their assistance in negotiating a transaction that would give it more security. Thereafter Liberty Coach had an audit of the partnership prepared for the purpose of analyzing the respective interests therein. This audit showed that Wilson's one-half interest in the net worth of the partnership was $5,200, plus reserves. Counting Wilson's original $2,000 deposit with the Bank and the reserves due, it was determined that Wilson's worth was approximately $18,000. After estimated contingent liability attributable to Wilson's share of the dealer reserves was subtracted from the $18,000 the auditor decided that a fair appraisal of Wilson's net worth was about $10,200. Liberty Coach was not satisfied that its interests were fully protected under a straight sale and therefore recommended the formation of a corporation whereby Liberty Coach could retain all of the stock thereof as security for the trailers and other inventory. Thereupon, Wilson and Barnard agreed to rescind their prior agreement in which Wilson *270 was to sell his interest to Barnard for $18,000 and caused on October 15, 1951, Liberty Trailer Sales of Texas, Inc., (hereinafter sometimes referred to as the corporation) to be formed. The following day, the partnership, in exchange for 100 shares of stock of the corporation, transferred to the corporation the following: all of the property and assets of said partnership business, of every kind and nature, wheresoever situated, real, personal and mixed, except that all funds or deposits which have been withheld as contingency reserves by the Michigan National Bank of Grand Rapids, Michigan, from the funds of J. M. Wilson and John P. Barnard individually or as members of this partnership, and which are now held by said Bank, shall not be included as a part of the partnership assets herein conveyed. * * *
The corporation assumed all of the liabilities of the partnership as they existed as of October 15, 1951. Of the 100 shares of stock, 49 shares were issued in Wilson's name, 50 shares in Barnard's name and 1 share in the name of Barnard's wife. The partnership was then dissolved and the stock distributed to Wilson and Barnard. Also on October 16, 1951, the corporation, *271 Wilson, and Barnard signed a note promising to pay to the order of Liberty Coach the sum of $62,453.37. This was the amount of the open account owed to Liberty Coach that was transferred to the corporation. The note stated, in part: In addition to the monthly payments on principal and interest as hereinbefore specified and so long as any part of the principal and interest of this note remains unpaid, Liberty Trailer Sales of Texas, Inc. does hereby agree: * * *
B. To immediately pay all sums of money received by it either directly or indirectly which are refunds of contingency reserves now held by the Michigan National Bank of Grand Rapids, Michigan in the names of J. M. Wilson and John P. Barnard individually and/or as members of a co-partnership composed of J. M. Wilson and John P. Barnard which did business as Liberty Trailer Sales of Texas, upon the principal and interest of this note. However, such payments, if any, shall not be considered as a payment on or a credit to the monthly payments as hereinbefore specified or on the additional payments as provided in part A of this paragraph. * * *
This note shall, at the option of the holder hereof, mature and become *272 immediately due and payable upon the happening of any one or more of the following events: * * *
E. The failure of J. M. Wilson or John P. Barnard to immediately pay (free and clear of all liens of any kind whatsoever including Federal income tax liability) all sums of money received by them which are refunds of contingency reserves now held by the Michigan National Bank of Grand Rapids, Michigan, in the names of J. M. Wilson and John P. Barnard, individually and as members of a co-partnership, composed of J. M. Wilson and John P. Barnard which did business as Liberty Trailer Sales of Texas, upon the principal and interest remaining due on this note, or as the holder of this note may direct. * * *
For the purpose of further securing the payment of the note, Wilson and Barnard executed a pledge agreement whereby they pledged, transferred and delivered to Liberty Coach the following collateral: J. M. Wilson - 49 shares of common stock of Liberty Trailer Sales of Texas, Inc. J. P. Barnard - 51 shares of common stock of Liberty Trailer Sales of Texas, Inc. Also, at this time Wilson gave Barnard an option to purchase the 49 shares of stock he owned for $10,025.06. Barnard *273 immediately exercised the option by paying $2,200 down and agreed to pay the balance prior to June 1, 1954. In 1954 Wilson received $8,964.26 for the remaining purchase price and interest of the 49 shares of common stock of the corporation sold to Barnard under said option. During 1954, the year under consideration, the Bank released part of the reserve account in the amount of $24,371.65. Of this amount, $8,717.66 represented reserves arising from sales made by Wilson as an individual; $8,303.75 was from sales of Barnard as an individual; and $7,350.24 was a release of reserves from sales made by the partnership. After endorsing them, Barnard forwarded all of the checks to Liberty Coach to reduce the indebtedness assumed by the corporation. Petitioner was on the cash basis method of accounting for the years he was in business as an individual. He did not include in his income for those years the dealer reserves when credited to him by thebank. The partnership was on an accrual method of accounting. Respondent determined that $12,139.17, representing one-half [1] of the dealer reserves released by the Bank in 1954, was income to petitioner in that year. *274 Opinion The statutory notice of deficiency upon which this case is based was mailed on July 30, 1960, more than three years after the 1954 return was filed. Respondent relies on section 6501(e)(1)(A) of the Code of 1954 [2] which provides that if a taxpayer omits from gross income an amount properly includable therein which is in excess of 25 percent of the amount of the gross income stated in the return, the tax may be assessed, or proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. The burden of proof is on the respondent to show (1) that the amount of income which was not reported was properly includable in gross income, and (2) that an amount in excess of 25 percent of the gross income shown on the return was omitted. Farber v. Commissioner, 312 F. 2d 729 (C.A. 2, 1962), affirming 36 T.C. 1142 (1961); Frank W. Williamson, 27 T.C. 647, 659 (1957) and cases cited therein. It is respondent's contention that the transfer of the partnership assets to the corporation specifically excluded the dealer *275 reserves and, since there was no agreement as to how the partnership's reserves were to be divided between the partners, we must resort to the original partnership agreement which provided that each partner was entitled to one-half of the property and profits of the partnership. Therefore, respondent argues, one-half of the released reserves in 1954 is income to petitioner in that year because he is on the cash basis, and the fact that he never received any of the checks is inconsequential because the money went to discharge petitioner's indebtedness to Liberty Coach as evidenced by the note he signed on October 15, 1951. Under the recent United States Supreme Court case of Commissioner v. Hansen, 360 U.S. 446 (1959), the reserves arising from the partnership withheld by the Bank constituted accrued income to the partnership, which was on an accrual method of accounting, at the time the withheld amounts were entered on the books of the Bank as a liability to the partnership. Individual partners on the cash method of accounting must determine their distributive share of partnership income on the basis of the same method of accounting used by the partnership in keeping *276 its books for the accounting period which ends with or within the taxable period of the individual partner. Sections 702 and 706(a). Respondent asserts that the partnership was not on an accrual method of accounting and that, even if it were, the dealer reserves were not in fact reflected in the partnership's computation of profits, so that a hybrid system of accounting was employed in treating the reserves as cash items. Respondent, although bearing the burden of proof, has offered no evidence to substantiate these claims. Therefore, petitioner's pro rata share (one-half) of the partnership reserves of $7,350.24 released by the Bank in 1954 was properly includable in income of petitioner for a prior taxable year or years but not in 1954, the year under consideration. The proper taxable period of the released reserves for the time when Wilson and Barnard conducted business as individuals is not so simply determined. Petitioner, who had been on a cash basis while conducting business as an individual, did not take the retained reserves into income, thereby maintaining a zero basis in the reserve account credited to him by the Bank. When this account was transferred to the partnership, *277 the partnership basis was also zero. Section 723. Petitioner's basis for his partnership interest was not increased in any amount by the transfer of the reserves to the partnership. Section 722. Upon dissolution of a partnership, the assets received by a partner will have a total basis equal to the adjusted basis of such partner's interest in the partnership, reduced by any money distributed to him. Section 732(b). However, this basis is to be applied first to any unrealized receivable (of which the reserves of the type here involved are included) and inventory items (not here involved) in an amount equal to the basis of such property to the partnership. Section 732(c). Since the basis to the partnership of the reserves arising from Wilson's sales as an individual was zero, the basis to the individual partners on a pro rata distribution of partnership assets would also be zero. Upon the dissolution of the partnership, Wilson received a right to only one-half of the reserves still held by the Bank as reserves from sales made by him as an individual. When the reserve account was transferred to the partnership, it became partnership property and under the partnership agreement petitioner *278 was entitled to only one-half of any and all partnership assets. We conclude, therefore, that one-half of $8,717.66, or $4,358.83, should have been included in petitioner's income in the year of release by the Bank, 1954. The reserves released which were originally created by Barnard as an individual would be handled in the same manner, if Barnard had been on the cash method of accounting for the years prior to the formation of the partnership. The reserve deposits would not have been taken into income in the years of discount. If Barnard, however, had been on the accrual method of accounting, the reserves would have been income in the years of discount. Commissioner v. Hansen, 360 U.S. 446 (1959). This would have created in him a basis for the reserves equal to the face amount of said reserves. Upon transfer of the reserves to the partnership, under section 723, the partnership would carry over to itself as its basis the same basis as that of Barnard. Upon dissolution of the partnership, each individual partner would take as his basis for his pro rata share of the reserves arising from the sales made by Barnard as an individual, the basis of such reserves in the *279 partnership, at least to the extent of the entire basis for his partnership interest. Section 732(c). This being so, upon release of the reserves by the Bank, there would be income, if any, only in excess of the basis. The record is devoid of any evidence as to the method of accounting used by Barnard prior to the formation of the partnership. This being the case, we cannot determine what part, if any, of the reserves released by the Bank from sales by Barnard as an individual should be included as income of petitioner in 1954, the year of distribution. In view of the foregoing we conclude that respondent has not sustained his burden of proving the affirmative allegations of his answer which read as follows: 9. That the gross income omitted by petitioners from their joint Federal income tax return for the taxable year 1954 and properly includable therein is in excess of the 25 percentum of the gross income stated in the return for said year, and that by reason of such omission the assessment and/or collection of the deficiency determined for said year may be made within six years from the date of filing of petitioners' income tax return for the year 1954 as provided in section 6501(e)(1)(A) of the Internal Revenue Code *280 of 1954. We further hold that the statute of limitations provided in section 6501(a) is applicable and that assessment of the deficiency determined by respondent against petitioners is barred by the statute of limitations. Decision will be entered under Rule 50. Footnotes
1. Although one-half of the released reserve amounts of $12,185.82, the notice of deficiency shows the amount representing petitioner's one-half share as $12,139.17.↩
2. All code references are to the 1954 Code.↩